IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Fishman Haygood Phelps Walmsley :
Willis & Swanson, L.L.P., and all others :
Similarly situated, :
: CIVIL ACTION NO. 1:09-CV-10533 (PBS)
Plaintiffs, :
:
v. :
:
State Street Corporation, State Street Bank & :
Trust Co., State Street Bank & Trust Co. of :
New Hampshire, and State Street Global :
Advisors, :
:
Defendants.

## PLAINTIFF'S SUPPLEMENTAL MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FOR LACK OF STANDING

Plaintiff Fishman Haygood Phelps Walmsley Willis & Swanson, LLP ("Plaintiff") respectfully submits this memorandum of law in further opposition to the Defendants' motion to dismiss Plaintiff's complaint for lack of Article III standing. As shown below, the Fishman Haygood Walmsley Wills & Swanson Profit Sharing Plan (the "Plan"), for which Plaintiff serves as a fiduciary, has suffered concrete and discernable monetary harm as a result of the Defendants' fiduciary breaches and thus has standing to pursue its ERISA claims here. Plaintiff relies on the accompanying Supplemental Declaration of Anthony Nazzaro dated January 15, 2010 ("Nazzaro Supp. Decl."), and the exhibits included in the accompanying appendix. Plaintiff also incorporates by reference the arguments made in Plaintiff's opposition to Defendants' Motion to Dismiss, Aug. 26, 2009 [Dkt. #32].

## INTRODUCTION

Although the financial vehicles at issue in this case are complex, the fact that the Plan sustained a "loss" for Article III standing purposes is clear and easily determined from the record evidence:

- Defendants admit that one of the funds they manage for the purpose of reinvesting securities lending collateral, the Quality D Short Term Investment Fund ("Quality D"), realized **REDACTED** loss during the 2008 calendar year. *See* Quality D Short-Term Investment Fund Financial Statements ("Quality D Financial Statements") at SS_FISH000694 (Ex. 1).[1]

- Quality D is one of the funds (the "Collateral Pools") in which Defendants invested securities lending collateral they received from borrowers in exchange for short term use of securities owned by the Collective Trusts. Given that the securities lending program was intended to provide incremental gains to institutional investors lending their securities, prudence required that State Street invest the collateral funds in short-term, highly liquid, safe instruments. Instead, Defendants breached their fiduciary duties to the Plan and the Class, and invested in illiquid, risky securities which lead to a nearly $15 million loss in Quality D alone. *See generally*, Complaint [Dkt. #1] ¶¶ 14-16, 35-39.

- The Plan invested in Quality D through its investment in comingled investment funds which included other institutional investors. Plaintiff refers to the investment funds in which the Plan invested as the "Collective Trusts" for purposes of this litigation.

- Gains and losses in Collateral Pools such as Quality D inure to investors in the Collective Trusts, such as the Plan, that invested in the Collateral Pools.

---

[1] Exhibits ("Ex.") are attached to the Declaration of Todd S. Collins submitted herewith.

2

- Thus, as an investor in Collective Trusts which invested in Quality D, the Plan shared in the REDACTED loss Quality D suffered as a result of Defendants' imprudence and misconduct. The Quality D loss reduced the value of Plan's investments in the Collective Trust.

- The Plan's loss is concrete, identifiable, particular, and non-speculative and, by itself, supports standing in this action.

The 30(b)(6) representative Defendants put forward in this litigation, Kathleen Mann, confirmed that the income generated — or in this case, the losses realized -- from a securities lending Collateral Pool (such as Quality D) flows from the Collateral Pool to the institutional investors (like the Plan and the ABA Trust) who invested in Collective Trusts that, in turn, invested in the Collateral Pool. *See* Excerpts from Jan. 6, 2010 Deposition of K. Mann ("Mann Tr.") (Ex. 2) at 22 (affirming that "income earned in the cash Collateral Pool for a lending commingled fund is added to the value of the fund and raises the unit price"). The unit price in a Collective Trust thus declined when, as here, the Collateral Pool in which it invested suffered realized losses. *See id.*

The fact that the Plan shared in this conceded, concrete loss establishes Plaintiff's Article III standing. In addition, as an investor in Collective Trusts that invested in Quality D, the Plan can show loss and injury by virtue of the fact that large institutional investors -- the Missouri teachers retirement funds and perhaps others -- exited State Street's Collateral Pools in late 2008 and early 2009 at the rate of $1.00 per unit. This was at a time that, due to losses, the Collateral Pools had "broken the buck" and their true value on a mark-to market basis was admittedly much below $1.00. (At year end 2008, the value was only $.93 per unit.) *See* Compl. ¶ 11.

Litigation between State Street and the Missouri funds followed the Missouri funds' exit from the Collateral Pools. Remarkably, counsel for State Street in that case, which concerned State Street's breach of duty in managing the Collateral Pools, *admitted* that the remaining Collateral Pool investors, such as the Plan and the ABA Trust, suffered concrete injury when the Missouri funds redeemed their investment from State Street-managed Collateral Pools at a full price of $1.00 per unit. As State Street's counsel explained in open court, when Missouri exited the Collateral Pool, it injured other investors like the Plan and the ABA Trust by "sucking out" the liquidity in the fund, leaving less liquidity for the remaining investors. *See Public School Retirement v. State Street Bank*, Mo. Cir. Court, Div. II, 09AC CC00524, September 22, 2009 Excerpts from Transcript of Proceedings at 12 (Ex. 3); *see also id.* at 24 ("there is a real tangible damage to the remaining investors here").

Plaintiff sought damages and standing-related discovery from Defendants through reasonable discovery requests, including a deposition of State Street on topics related to economic injuries. As detailed in Plaintiff's motion to compel, filed contemporaneously with this submission, State Street's designee could not answer many basic questions, and yet Defendants refused to continue the 30(b)(6) deposition. Plaintiff believes that the additional, withheld information would further demonstrate and corroborate the losses that the Plan, and other similarly situated plans, experienced as a result of Defendants' misconduct. Yet, even without this requested information, the evidence of the Plan's losses is more than sufficient to satisfy Article III's "injury in fact" standing requirements which are "very generous," requiring only that claimant "allege[ ] some specific, 'identifiable trifle' of injury. . ." *Bowman v. Wilson*, 672 F.2d 1145, 1151 (3d Cir. 1982).

## STATEMENT OF FACTS

Plaintiff is the Plan Administrator for the Plan, which is a retirement plan governed by ERISA. Compl. ¶ 21. The Plan's assets are held and invested through the American Bar Association's Members/State Street Collective Trust ("ABA Trust"), a master trust that holds the assets of hundreds of law firm retirement plans. *See* Excerpts from the ABA Members/State Street Collective Trust Form S-1/A (Jan. 23, 2009) (Ex. 4).

The Plan, through the ABA Trust, and the other retirement plans in the proposed Class invest in Collective Trust investment funds that were established for the collective investments by groups of institutional investors. (Mann Tr. at 15). All members in the Collective Trusts share, *pro rata*, in the same gains and losses. The State Street Collective Trusts at issue in this case are not registered or publicly traded. *See* Excerpts from American Bar Association Members/State Street Collective Trust 2008 Form 10-K ("ABA 2008 10-K") at SS_FISH 0001555 (Ex. 5).[2]

The Collective Trusts are administered and offered by the State Street Defendants, supposedly according to a stated investment policy. Generally, the Collective Trusts are measured against an established benchmark. For example, the performance of the Index Equity Fund, one of the several Collective Trusts in which the Plan invested, is measured against the performance of the Russell 3000 Index. Almost all the Collective Trusts in which the Plan invested in 2008 and 2009 participated in Defendants' securities lending program. (See note 1, infra.) As the Complaint describes, the securities lending program allows the long-term owner of

---

[2] Specifically, the Plan invested in the Stable Asset Return Fund Intermediate Bond Fund; Balanced Fund; Large-Cap Value Equity Fund; Large-Cap Growth Equity Fund; Index Equity Fund; Mid-Cap Value Equity Fund; Mid-Cap Growth Equity Fund; Small Cap Equity Fund; International Equity Fund; 2010 Retirement Date Fund; 2020 Retirement Date Fund; 2030 Retirement Date Fund; and 2040 Retirement Date Fund.

5

a stock (or other security) to loan that security from its portfolio to a borrower who needs it for short term purposes. The borrower secures the loan with collateral of a value slightly greater than the value of the loaned securities. The Collective Trusts loaned securities to borrowers and collected collateral equal to 102-105% of the value of the borrowed securities. State Street invested the collateral in other instruments through the Collateral Pools, which were established for that purpose.

As Defendants admit, the purpose of the securities lending program is to generate "incremental income [for the] lender." (Mann Tr. at 16). A responsible fiduciary managing securities lending funds invests the collateral in safe, short-term, liquid instruments in order to obtain incremental investment income from the collateral. *See generally* Declaration of Anthony A. Nazzaro, Aug. 26, 2009 ("Nazzaro August Decl."). If the collateral is invested in secure, short term investments such as U.S. government bonds, an institutional investor engaging in securities lending may safely earn some incrementally greater return for little risk. *See id.*

Defendant State Street Bank and Trust Company ("State Street"), which is the trustee for two ABA Trust sub-trusts, appointed itself "in its institutional capacity" to act as lending agent for the purpose of loaning securities held by State Street in its capacity as trustee for the ABA Trust. State Street created and appointed itself as trustee for three Collateral Pools created for the purpose of investing and managing collateral: (1) the Quality Trust for SSgA Funds Trust Fund ("Quality Trust"); (2) the Super Collateral Fund ("Super Fund"); and (3) Quality D. State Street created the investment guidelines for the Collateral Pools and managed them. Quality D was the Collateral Pool for the lending Collective Trusts offered through the ABA Trust until September 2008, when State Street created the Quality Trust for the benefit of those Collective

Trusts that were advised by State Street portfolio managers. (Mann Tr. 48:6-11).[3] Collective Trusts advised by portfolio managers not affiliated with State Street continued to use the Quality D Collateral Pool to the present. (*Id.* 52:8-12).[4]

As noted above, Quality D's financial statement for the year ending 2008 reports **REDACTED** *See* Quality D Financial Statement SS_FISH000693 (Ex. 1). This indicates that Quality D realized a loss on its investments in this amount in 2008. *See id.; see also* Mann Tr. at 43.

Income from a Collateral Pool such as Quality D flows to the benefit of investors in a Collective Trust, such as the Plan, in two ways. First, income from the Collateral Pool is added to the Collective Trust's value, thus raising the price per unit in the Collective Trust. (Mann Tr. 21-22, 98-100). The second way lending income from the Collateral Pools transfers to the Collective Trust's investors is that the income flows directly into the Collective Trust and is then distributed to the Collective Trust's investors *pro rata*. *Id.* at 99. When a Collateral Pool suffers a loss – as did Quality D in 2008 – those losses necessarily reduce the income received by Collective Trusts from the Collateral Pool. But for such losses, the net asset value of a Collective Trust unit or the income distributed to Collective Trust investors would be greater. The amount of income received by a Collective Trust from securities lending is reported in the financial statement for the Collective Trust. *Id.* at 22.

---

[3] The Retirement Date Funds and other funds advised by a State Street portfolio manager have an interest in the Quality Trust or Series Quality Trust Collateral Pools. (Mann Tr. 48:6-11, 53-54). Funds advised by both affiliated and unaffiliated portfolio managers have an interest in Quality D and Quality Trust or Series Quality Trust. (*Id.* 93:4-11).

[4] The following Collective Trusts were advised by portfolio managers not affiliated with State Street and therefore had an interest in Quality D: Stable Asset Return Fund; Intermediate Bond Fund; Balanced Fund; Large-Cap Value Equity Fund; Large-Cap Growth Equity Fund; Mid-Cap Value Equity Fund; Mid-Cap Growth Equity Fund; Small Cap Equity Fund; International Equity Fund. (Mann Tr. 70-89).

7

In the Complaint, Plaintiff alleges that Defendants violated ERISA by failing to exercise required prudence and care and by engaging in self-dealing with respect to their management of their Collateral Pools. *See generally*, Compl. Given that the purpose of the securities lending program was to generate incremental returns on short-term investments with very low risk and high liquidity, short-term, highly liquid instruments are the only types of investments that were and are appropriate. *See generally* August Nazzaro Decl. To that end, State Street Lending Agreements provide that State Street will invest in short-term instruments, short term investment funds maintained by State Street, money market mutual funds, and such other instruments.

Plaintiff filed suit on behalf of the Plan and a class of similarly-situated retirement plans seeking relief from Defendants' breaches of their fiduciary duties of prudence and loyalty and concerning Defendants' prohibited transactions under ERISA. Plaintiff claims that it was injured and suffered losses as a result of the Defendants' improper management of the Collateral Pools. And Plaintiff here seeks compensation for the aforementioned losses.

## ARGUMENT

### A. PLAINTIFF HAS ARTICLE III STANDING

The doctrine of standing limits the jurisdiction of federal courts to "those disputes which are appropriately resolved through the judicial process." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). In order to have standing to invoke the power of a federal court, a plaintiff must present a "case or controversy" within the meaning of Article III of the Constitution. *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585 (8th Cir. 2009). This requires a plaintiff to show the existence of an "injury in fact" to the plaintiff that is "fairly traceable to the challenged action of the defendant," and "likely [to] be redressed by a favorable decision." *Lujan*, 504 U.S. at 560-61.

Article III standing requirements "are expressed in a familiar three-part algorithm: a would-be plaintiff must demonstrate a concrete and particularized injury in fact, a causal connection that permits tracing the claimed injury to the defendant's actions, and a likelihood that prevailing in the action will afford some redress for the injury." *Maine People's Alliance & Natural Res. Def. Council v. Malinkrodt, Inc.*, 471 F.3d 277, 283 (1st Cir. 2006) (*citing Lujan*, 504 U.S. at 560-61). The injury sustained by the Plan, as well as the injuries sustained by other members of the proposed Class, satisfies all three requirements.

The First Circuit has recognized that "at the pleading stage 'injury-in-fact' need not entail currently *realized* economic loss." *Adams v. Watson*, 10 F.3d 915, 920 (1st Cir. 1993) (emphasis in original). Moreover, federal courts have recognized that depressed property values, which may be unrealized until a property is sold, may constitute sufficient injury for the purpose of constitutional standing. *See, e.g., Allandale Neighborhood Ass'n v. Austin Transp. Study Policy Advisory Comm.*, 840 F.2d 258, 162-63 (5th Cir. 1988); *Friedman v. Harold*, 638 F.2d 262, 265 (1st Cir. 1981) ("Economic injury, even of an indirect nature, will establish sufficient concrete adverseness to meet the Article III 'case or controversy'" requirement).

1. **The Plan Sustained A Concrete Loss**

The injury-in-fact inquiry "serves to distinguish a person with a *direct stake* in the outcome of a litigation -- *even though small* -- from a person with a mere interest in the problem." *Adams v. Watson*, 10 F.3d 915 (1st Cir. 1993) *citing (United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 690 n. 14, 93 S.Ct. 2405, 2417 n.14, 37 L.Ed. 2d 254 (1973) (*citing* Kenneth C. Davis, *Standing: Taxpayers and Others*, 35 U.Chi.L.Rev. 601, 613 (1968) ("an identifiable trifle is enough for standing to fight out a question of principle")) (emphasis added); *see Bowman v. Wilson*, 672 F.2d 1145, 1151 (3d Cir.

9

1982) ("The contours of the injury-in-fact requirement, while not precisely defined, are very generous," requiring only that claimant "allege [ ] some specific, 'identifiable trifle' of injury..."); *Tax Analysts & Advocates v. Blumenthal*, 566 F.2d 130, 138 (D.C. Cir. 1977) (distinct and palpable competitive injury is injury-in-fact for standing purposes even if economic injury is slight in magnitude), *cert. denied*, 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed. 2d 791 (1978). Courts "may reasonably expect that a person so harmed will, as best he can, frame the relevant questions with specificity, contest the issues with the necessary adverseness, and pursue the litigation vigorously." *Barlow v. Collins*, 397 U.S. 159, 172, 90 S.Ct. 832, 841, 25 L.Ed. 2d 192 (1970).

As explained above, according to State Street's financial statements, Quality D was one of the Collateral Pools in which Defendants invested cash collateral received from borrowers utilizing its securities lending program. *See* (Ex. 5 at SS_FISH 0001792). According to the Quality D Financial Statements,

**REDACTED**

Several of the Collective Trusts in which the Plan invested engaged in securities lending and received income from Quality D. *See* Ex. 5, ABA 2008 10K at (SS_FISH0001509; Mann Tr. 73- 76; note 3, *supra*. Given that Quality D suffered concrete, realized losses as documented in its financial statements, the investment income that flowed from Quality D to each of the Collective Trusts in which the Plan participated was also, in turn, reduced. Nazzaro Decl. at ¶¶ 8. As a result, the Plan, as an investor in several Collective Trusts that received income from Quality D, in turn, suffered a loss in its *pro rata* share of the investment income received from Quality D. The Plan's investments in the Collective Trusts thus lost value. *Id.*

Defendants admit that the performance of the Collateral Pools such as Quality D affects the value of the securities lending Collective Trusts – raising or lowering the unit price of the Collective Trusts or raising or lowering the amount of investment income the Collective Trusts receive. *See* Mann Tr. at 22:6-21.

Mr. Nazzaro, an expert on securities lending practices, explains that "any diminution of the total return earned by the Quality D Fund results in lower performance for each of the participant Collective Trust Funds, including the eight ABA Funds." Nazzaro Decl. at 8.

In addition to the direct loss Plaintiff sustained as a result of the loss Quality D sustained (which flowed to the Collective Trust and then to the Plan), Plaintiff can demonstrate that the Plan was injured and has standing based on other undisputed facts. In late 2008 and early 2009, the Missouri teachers retirement funds -- and perhaps other large institutional investors -- liquidated their Collective Trust holdings, withdrew billions of dollars from State Street's Collateral Pools, and exited State Street's securities lending program. The Missouri funds exited Quality D at the price of $1.00 per unit even though, due to the losses Quality D had sustained, the Collateral Pool had "broken the buck" and the true market value of its units was substantially lower. At year end 2008, the Collateral Pool's value had declined to 93 cents per unit. Compl. ¶ 11.

In pending litigation between the Missouri funds and State Street arising out of State Street's breach of duty in managing the Collateral Pools, which directly led to the Missouri funds' large-scale withdrawal from State Street's securities lending program, counsel for State Street admitted that Missouri's enormous withdrawal from the Collateral Pools injured other Collateral Pool investors, such as the Plan. Such injury occurred, according to State Street's counsel, because the remaining Collateral Pool investors were left with an interest in a Collateral

11

Pool that had less liquidity and held "worse-performing assets" as a result of Missouri's departure:

> And so it's unfair to the other investors to allow one investor like Missouri to suck out all the liquidity and get one dollar per unit and leave the rest of the investors holding the bag, a fund that is stripped of much of its liquidity, a fund which is then weighted more heavily in security of long-term maturities but tend to be worse-performing securities.

*Public School Retirement v. State Street Bank*, Mo. Cir. Court, Div. II, 09AC CC00524, September 22, 2009 Transcript of Proceedings at 12 (Ex. 3).

Given these facts, evidence, and admissions, there can be no principled dispute as to whether Plaintiff sustained a loss sufficient to support its standing to pursue this case. Plaintiff has alleged and has shown that it has suffered a concrete and particularized injury.

### 2. Plaintiff Has Alleged A Causal Connection Between Its Claimed Injury and Defendants' Actions; If Plaintiff Prevails In This Action It Will Likely Be Afforded Some Redress For Its Injury

Plaintiff has properly alleged a causal connection between the Plan's injury and Defendants' actions. The allegations in the Complaint describe Plaintiff's claim that the losses sustained in the Collateral Pools (which flowed to those Collective Trusts invested in the Collateral Pools) and to the Plan (as an investor in those Collective Trusts) occurred because Defendants failed to fulfill their fiduciary responsibilities and breached their fiduciary duties by causing the Collateral Pools to invest in illiquid, long-term, risky securities. Plaintiff contends that Quality D and other Collateral Pools that were part of Defendants' securities lending program suffered losses that were passed on to the Plan and other Plans as a direct result of Defendants' fiduciary breaches. Thus, the requirement of an alleged connection between the loss and the conduct at issue is satisfied. The mere fact that Defendants dispute the existence of this causal connection does not defeat Plaintiff's Article III standing.

Moreover, Plaintiff seeks monetary damages and equitable relief. Should Plaintiff prevail in this litigation, the losses that the Plan sustained as a result of Defendant's fiduciary breaches can be compensated with money and injunctive relief preventing the re-occurrence of similar problems in the future. Thus, the final standing requirement -- that Plaintiff would likely receive redress for the injury it suffered if it prevails in this litigation -- is likewise satisfied.

### 3. Defendants' NAV-Based Arguments Concerning Standing Are Meritless

Defendants may argue, as they did in their initial motion to dismiss briefing, that participants in the Collateral Pools continue to "transact at a dollar" or that certain participants in the Collateral Pools may exit at $1.00 per unit and that Plaintiff thus lacks standing. Whether Collateral Pool participants thus transact, however, does not bear on the Article III standing inquiry. As noted before, the Plan suffered losses as an investor in Collective Trusts that received diminished income from Collateral Pools that suffered identifiable losses as a result of Defendants' fiduciary breaches and other misconduct. Ultimately, whether Collective Trusts or other investors in Collateral Pools may redeem interests in the Collateral Pools at the nominal $1.00 per unit has nothing to do with the loss that the Plan and other plans *have already suffered* as a result of the negative impact of Collateral Pool's losses on Collective Trust unit values.

In any event, whether or not a participant in a Collateral Pool may redeem at a $1.00 unit price is entirely within the control of State Street because the reported value of the instruments in the Collateral Pools is entirely within State Street's discretion. As the 2008 10-K explains, if:

> a significant disparity develops between the constant net asset value and the market based net asset value of Quality D, the Trustee of Quality D may determine that continued redemption at a constant $1.00 net asset value would create inequitable results for the Quality D unit holders. In these circumstances, the Trustee of Quality D, in its sole discretion, and acting in a manner it deems appropriate and fair on behalf of all Quality D unit holders, may adjust the valuation of the units or assets of Quality D until such time as the disparity

13

> between the market-based and the constant net asset value per unit is deemed to
> be immaterial.

*Id.* at F-6 (Ex. 5); *See also* ABA Retirement Funds Program July 2, 2009 Prospectus (when State Street believes market pricing is not accurate, it determines the value of an instrument in "good faith" using "fair value" pricing).

Given the absolute (and presumably self-interested) control that Defendants exercise over the nominal unit values of the Collateral Pool, whether or not redemptions may occur at $1.00 per unit is not a viable means of determining whether cognizable losses have occurred here. Among other things, State Street could allow a single entity to redeem at $1.00 per unit, but this could harm other entities with assets in the Collateral Pool (as the Missouri redemptions harmed Plaintiff, for instance). In the end, Defendants' telling resort to tautology in attempting to obtain standing-related dismissal here – *i.e.,* arrogating to themselves the plenary right to define securities lending-related asset values and then insisting that Plaintiff cannot sue because Defendants have determined that Plaintiff has suffered no real loss of value – underscores the weakness of Defendants' position here. Plaintiff has standing; this action should proceed.

## CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss the Complaint for lack of standing should be denied.

Dated:                                                                                   Respectfully submitted,

|  | /s/ Mark T. Johnson |
|---|---|
| Matthew P. McCue (BBO #565319) | Todd S. Collins |
| LAW OFFICE OF MATTHEW P. McCUE | Shanon J. Carson |
| 179 Union Avenue | Ellen T. Noteware |
| Framingham, MA 01702 | BERGER & MONTAGUE, P.C. |
| Telephone: (508) 620-1166 | 1622 Locust Street |
| Facsimile: (508) 820-3311 | Philadelphia, PA 19103 |
|  | Telephone: (215) 875-3000 |
|  | Facsimile: (215) 875-46204 |
| Todd M. Schneider |  |
| Mark T. Johnson |  |
| SCHNEIDER WALLACE COTTRELL | Brian A. Glasser |
|   BRAYTON KONECKY LLP | Michael L. Murphy |
| 180 Montgomery Street, Suite 2000 | BAILEY & GLASSER LLP |
| San Francisco, CA 94108 | 209 Capitol Street |
| Telephone: (415) 421-7100 | Charleston, WV 25301 |
| Facsimile: (415) 421-7105 | Telephone: (304) 345-6555 |
|  | Facsimile: (304) 342-1110 |
| Garrett W. Wotkyns |  |
| SCHNEIDR WALLACE COTTRELL | Gregory Y. Porter |
|   BRAYTON KONECKY LLP | BAILEY & GLASSER LLP |
| 7702 E. Doubletree Ranch Rd, Ste.300 | 601 Pennsylvania Avenue, NW |
| Scottsdale, AZ 85258 | Suite 900, South Building |
| Telephone: (480) 607-4368 | Washington, DC 20004 |

*ATTORNEYS FOR PLAINTIFF*