# IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| FISHMAN HAYGOOD PHELPS WALMSLEY, WILLIS & SWANSON, L.L.P., *and all others similarly situated*, <br><br> Plaintiffs, <br><br> vs. <br><br> STATE STREET CORPORATION, STATE STREET BANK & TRUST COMPANY, STATE STREET BANK & TRUST COMPANY OF NEW HAMPSHIRE, AND STATE STREET GLOBAL ADVISORS, <br><br> Defendants. | CASE NO. 1:09-cv-10533-PBS |

## <u>SUPPLEMENTAL MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANTS' MOTION TO DISMISS</u>

Jeffrey B. Rudman (BBO #433380)
Phillipa J. Gage (BBO #664528)
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000
Facsimile: (617) 526-5000

Lori A. Martin (*pro hac vice*)
Dawn M. Wilson (*pro hac vice*)
Brad E. Konstandt (*pro hac vice*)
WILMER CUTLER PICKERING
HALE AND DORR LLP
399 Park Avenue
New York, NY 10022
Telephone: (212) 230-8800
Facsimile: (212) 230-8888

*Counsel for Defendants State Street Corporation, State Street Bank & Trust Company of New Hampshire, and State Street Bank & Trust Company (including its division State Street Global Advisors)*

# Table of Contents

**Page**

PROCEDURAL HISTORY..................................................................................................1

ARGUMENT..................................................................................................................2

I.      THE FISHMAN PLAN HAS INCURRED NO ECONOMIC INJURY AS A
        RESULT OF ITS INVESTMENT IN FUNDS THAT PARTICIPATE IN
        SECURITIES LENDING ..................................................................................2

      A.      The Fishman Plan Has Incurred No Out of Pocket Losses as a
                Result of Securities Lending and the Income It Has Received From
                Securities Lending Exceeds the Unrealized Losses..................................3

      B.      The Returns That the Fishman Plan Earned on the Cash Collateral
                Pool Exceed the Returns that the Plan Would Have Received on
                the So-Called Hypothetical, Prudent Portfolio .......................................7

      C.      The Fishman Plan May Withdraw Immediately and Without
                Penalty From the Securities Lending Program ......................................10

      D.      The Fishman Plan Cannot Particularize an Injury Relating to the
                Missouri Funds' Exit From the Securities Lending Program ...............12

      E.      The Current Investment Guidelines Are Prudent and Injunctive
                Relief Would Be Moot.........................................................................14

CONCLUSION.............................................................................................................16

# Table of Authorities

**Page**

Cases

*Adams v. Watson*,
   10 F.3d 915 (1st Cir. 1993)...........................................................................4

*Evans v. Akers*,
   534 F.3d 65 (1st Cir. 2008)...........................................................................7

*In re Boston Scientific Corp. ERISA Litig.*,
   254 F.R.D. 24 (D. Mass. 2008).....................................................................9

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992).......................................................................................2

*Ramirez v. Ramos*,
   438 F.3d 92 (1st Cir. 2006)...........................................................................2

Federal Statutes

15 U.S.C. § 80a-2(a)(41).....................................................................................11

Defendants State Street Corporation, State Street Bank & Trust Company of New Hampshire, and State Street Bank & Trust Company (including its division State Street Global Advisors) ("State Street"), submit this supplemental memorandum of law in further support of their motion to dismiss for lack of subject matter jurisdiction. As set forth below, the Complaint should be dismissed because Fishman Haygood Phelps Walmsley Willis & Swanson LLP ("Plaintiff" or "Fishman Plan") has not been injured by investing in funds offered by the American Bar Association Members/State Street Collective Trust ("ABA Trust") that participated in State Street's securities lending program.

## PROCEDURAL HISTORY

Plaintiff filed this action on April 7, 2009, claiming that it and other ERISA plans had "suffered losses" as a result of alleged breaches of fiduciary duty by the State Street Defendants. *See* Complaint, dated April 7, 2009 at ¶ 1. Defendants moved to dismiss this action on June 22, 2009, arguing that the Fishman Plan suffered no injury within the meaning of Article III or under ERISA because the Fishman Plan had incurred no out of pocket losses, the unrealized losses did not preclude transactions between the lending funds and the cash collateral pools at the $1.00 per unit price, and the Plan had earned handsome returns. The Court deferred ruling on the motion, stating that "[t]here are too many nuances and tangles" regarding injury and the parties should develop a record on whether the Fishman Plan had been injured. Transcript of Hearing, dated October 14, 2009 ("Tr.") at 48.[1] The Court ordered the parties to develop a "jurisdictional record, a 12(b)(1) record . . . on whether or not there's injury or not." Konstandt Decl., Ex. A (Tr. at 48-49). Three months of discovery followed, including fact and expert testimony regarding cash collateral pool returns and the impact of securities lending on the Fishman Plan.

---

[1] The transcript of the hearing is attached at Exhibit A to the Declaration of Brad E. Konstandt, dated February 23, 2010 ("Konstandt Decl.").

**ARGUMENT**

**I.**

**THE FISHMAN PLAN HAS INCURRED NO ECONOMIC INJURY AS A RESULT OF ITS INVESTMENT IN FUNDS THAT PARTICIPATE IN SECURITIES LENDING**

Although Plaintiff's supplemental opposition recites the mantra that the "[Fishman] Plan's loss is concrete, identifiable, particular, and non-speculative[,]"[2] nowhere does the opposition specify what, if any, loss the Fishman Plan has incurred. Plaintiff does not, for example, particularize its out of pocket losses. Nor does Plaintiff, which can exit the securities lending program at will, specify how it imminently will incur unrealized losses in the cash collateral pools. And, notwithstanding the fact that Plaintiff purports to be seeking non-specific returns from a hypothetical, prudently managed portfolio, the ABA Trust, and as a result of its participation, the Fishman Plan earned handsome returns from the cash collateral pools – far in excess of the returns that it would have received under Plaintiff's so-called prudently managed portfolio. It is no surprise that Plaintiff can do no more than recite the mantra of a "particular" loss. Fact and expert discovery confirmed that the Fishman Plan has not been injured as a result of its investment in funds that engage in securities lending and actually earned more than $8,000 from its participation in the securities lending program. Plaintiff, therefore, has not met its burden of establishing an injury in fact. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) ("The party invoking federal jurisdiction bears the burden of establishing [the elements of standing]"); *Ramirez v. Ramos*, 438 F.3d 92, 97 (1st Cir. 2006) ("the plaintiff bears the burden of demonstrating [the requirements of Article III]").

---

[2] *See* Plaintiff's Supplemental Memorandum of Law in Opposition to Defendants' Motion to Dismiss for Lack of Standing, dated January 15, 2010 ("Opp. II") at 3.

**A.    THE FISHMAN PLAN HAS INCURRED NO OUT OF POCKET LOSSES AS A RESULT OF SECURITIES LENDING AND THE INCOME IT HAS RECEIVED FROM SECURITIES LENDING EXCEEDS THE UNREALIZED LOSSES**

State Street has prudently managed the cash collateral pools and none of the pools has suffered a default on its underlying securities.  *See* Konstandt Decl., Ex. B (December 31, 2008 Financial Statements for the State Street Bank and Trust Company Quality D Short Term Investment Fund at SS_FISH 0000689) ("During 2008, the Fund did not suffer any defaults on its underlying securities, and none of the underlying securities was otherwise impaired").  A detailed examination of the Fishman Plan's investment confirmed that, on a total return basis, it has incurred no economic damages resulting from its investment in funds available through the ABA Trust that participated in the securities lending program.  *See* Declaration of Robert J. Mackay, Ph.D., dated February 23, 2010 ("Mackay Decl.") at ¶¶ 13, 20, 22, 37-38, 43-44.

Defendants' expert, Dr. Mackay, analyzed monthly data relating to investments made by the Fishman Plan in the ABA Trust funds that engaged in securities lending for the period January 1, 2007 through January 31, 2010.  Mackay Decl. at ¶¶ 20, 25-26.  He concluded: (1) there were no defaults in the cash collateral pools (*id.* at ¶¶ 22, 41); (2) the Fishman Plan did not have out of pocket losses attributable to securities lending during the putative class period – January 1, 2007 through December 31, 2008 (*id.* at ¶¶ 23, 36); (3) the Fishman Plan has continued to invest in the ABA Trust and, as of January 31, 2010, has incurred no out of pocket losses from securities lending activities (*id.* at ¶¶ 20, 22, 37); and (4) the Fishman Plan earned more than $8,000 in income from securities lending (*id.* at ¶¶ 20, 43-44 and Ex. 3).

By contrast with the non-quantified claim of loss suggested by Plaintiff's supplemental briefing,[3] a detailed review of the Fishman Plan account statements demonstrates that the Fishman Plan profited from the ABA Trust's participation in securities lending. As of January 31, 2010, the Fishman Plan received $8,587 in securities lending income and incurred no out of pocket losses. Mackay Decl. at ¶¶ 20, 43-44; Mackay Decl., Ex. 3. As an economic measure, Dr. Mackay explained that unrealized losses are an inappropriate measure of damages in this case. *Id.* at ¶¶ 16-17, 21-23, 36-39; Mackay Decl., Ex. 2. Notably, the unrealized losses assume a hypothetical and immediate liquidation of collateral pool assets at 2008 prices, during the height of the liquidity crisis and mere months after the bankruptcy filing of Lehman Brothers. *Id.* at ¶¶ 22, 40. The Trustee for the cash collateral pools did not, however, liquidate the cash collateral pool assets during this period, and the net asset value of the Quality D cash collateral pool has steadily increased from its low in December 2008 of $0.9231 per unit to $0.9895 per unit as of January 31, 2010. *Id.* at ¶¶ 22, 39; Mackay Decl., Ex. 2.

Dr. Mackay's treatment of unrealized losses in this case is in accord with First Circuit precedent, which considers an unrealized economic loss an injury in fact within the meaning of Article III only when the unrealized loss is "premised, at a minimum, on particularized future economic injury which, though latent, nonetheless qualifies as '*imminent*'." *Adams v. Watson*,

---

[3] *See* Konstandt Decl., Ex. C (Transcript of Deposition of Mr. Joseph C. Peiffer, dated February 9, 2010 ("Peiffer Tr.") at 63-64) ("Q: Okay. [At the time you brought this lawsuit], [y]ou didn't know what your individual damages were and you didn't know what the plan's damages were; correct? Mr. Wotkyns: Object to form. A: Right. Q: All right. Sitting here today, right now, February 11th, is that the right date? February 9th. February 9th, 2009, can you tell me what you estimate your individual damages are? A. No. Q. Sitting here today can you tell me what your best estimate is as to the Fishman Plan's individual damages? A. No, I'm not sure that we have calculated those figures yet").

10 F.3d 915, 920-21 (1st Cir. 1993) (emphasis supplied).[4]  Any concept of imminent injury is missing here because it assumes two "hypothetical and extreme scenarios":  namely, that the cash collateral pools would be forced to sell investments at a loss to meet liquidity needs, or that the ABA Trust would request an in-kind distribution of cash collateral pool assets and subsequently decide to liquidate those assets rather than hold them to maturity.  Mackay Decl. ¶¶ 38, 42, 44.[5]  Yet, even if this Court were inclined to treat unrealized losses in the cash collateral pools as a component of Fishman Plan returns from the securities lending program, the income that the Plan received from securities lending *exceeded* the unrealized losses in the cash collateral pools by $3,050.  Mackay Decl. ¶¶ 20, 44; Mackay Decl., Ex. 3.

Plaintiff presented no contradictory evidence regarding the impact of securities lending on Fishman Plan performance.  Mr. Anthony A. Nazzaro, the expert retained by Plaintiff to bolster its claim of injury, conceded that he had no information on Fishman Plan losses:

> Q:    Have you computed the allocation of unrealized and realized losses in Quality D to the Fishman Plan?
>
> A:    I actually have no knowledge of the Fishman Plan.  No reports or data.
>
> Q:    Okay.  So you don't know whether they've incurred a loss or not?
>
> A:    No.

---

[4] In its citation to the *Adams* decision at page 9 of its supplemental brief, and in support of a claim that unrealized losses should be treated as an injury, Plaintiff omitted the sentence describing an imminent requirement of injury.

[5] Plaintiff's expert did not dispute the hypothetical nature of unrealized losses.  He did not know, for example, whether any of the unrealized losses in the cash collateral pools would become realized losses.  *See* Konstandt Decl., Ex. D (Transcript of Deposition of Mr. Anthony A. Nazzaro, dated February 18, 2010 ("Nazzaro Tr.") at 130-31).  He conceded, however, with respect to two particular asset-backed securities that he earlier identified as having incurred significant unrealized losses (Nazzaro Decl. I at Appendix 3), one had matured at par (Konstandt Decl., Ex. D (Nazzaro Tr. at 146)), and the other appeared to be "accreting toward par." Konstandt Decl., Ex. D (Nazzaro Tr. at 154).

Mr. Collins: Objection.

A:      I don't know anything about it, no.

Konstandt Decl., Ex. D (Nazzaro Tr. at 169).

In the absence of any record that the *Fishman Plan* suffered economic damage from securities lending, Plaintiff argues that its claim for loss "is clear and easily determined" because Quality D, a $95 billion cash collateral pool sold an investment for $14.9 million less than amortized cost.  Opp. II at 2 and Collins Decl., Ex. 1 at 2 (Quality D Statement of Financial Operations itemizing the net realized loss on investments).[6]  Mr. Nazzaro opined that this transaction resulted in a loss of $70,986 to all investors in the ABA Trust.  Declaration of Anthony A. Nazzaro, dated January 15, 2010 ("Nazzaro Decl. II") at ¶ 7.  Of this amount, Mr. Peiffer confirmed that the lost revenue to the Fishman Plan totaled approximately $112.  *See* Konstandt Decl., Ex. C (Peiffer Tr. at 240-42).[7]  *See also* Konstandt Decl., Ex. D (Nazzaro Tr. at 203).[8]

---

[6] While Plaintiff makes much of the $14.9 million net realized loss in a cash collateral pool that generated more than $2.85 billion in income (Opp. II at 2 (contending that Defendants "invested in illiquid, risky securities which lead to a nearly $15 million loss in Quality D alone"), there is little likelihood that the Fishman law firm could represent all investors in the Quality D Fund, much less the investors in all of the Collective Trust Funds that participated in State Street's securities lending program.  Plaintiff invested only in the Collective Trust Funds offered through the ABA Retirement Funds, and is therefore limited in that respect.  Moreover, as the Court stated during the October 14, 2009 hearing on State Street's motion to dismiss, the Fishman law firm may not be a typical or adequate plaintiff because of its "stake in other cases where it appears on the list of lawyers."  Konstandt Decl., Ex. A (Tr. at 56).  Plaintiff has since admitted that it is involved in numerous other litigations (and potential future litigations) with the counsel representing it in this matter.  *See* Konstandt Decl., Ex. C (Peiffer Tr. at 102-05).

[7] Mr. Peiffer testified as follows:  "Q:  And that means the injury you're here to assert today is approximately $112.00?  A:  Okay.  I mean subject to checking the math.  Okay.  Q:  So subject to checking the math, will you agree with me that your firm's pro rata share of the damages, if damages there be at all is $112.00?  Mr. Wotkyns:  Objection to form.  A:  Yeah, I mean, I'd have to see what our – what all of our damages are and what all the expert has to say and I'd like to check your math, but doing it I will say that if your calculations are correct, that

Although there is no economic principle for excluding income when assessing the total return on Plaintiff's investment in the cash collateral pools, Plaintiff disregarded entirely the $8,581 in securities lending income that the Plan received. *See* Mackay Decl. at ¶¶ 23, 27, 42. By ignoring the income that the Fishman Plan earned from the securities lending program, Plaintiff manufactures "an identifiable trifle" – such as $112 – and argues that it has standing to bring this action. Opp. II at 9. Whether Plaintiff has standing to pursue an action cannot be assessed according to losses in particular securities in the pool; rather, investment performance should be assessed according to the performance of the entire cash collateral pool. *Cf. Evans v. Akers*, 534 F.3d 65, 74 (1st Cir. 2008) (measuring returns against the "performance of a prudently invested *portfolio*") (emphasis supplied).

**B.**     **THE RETURNS THAT THE FISHMAN PLAN EARNED ON THE CASH COLLATERAL POOL EXCEED THE RETURNS THAT THE PLAN WOULD HAVE RECEIVED ON THE SO-CALLED HYPOTHETICAL, PRUDENT PORTFOLIO**

Plaintiff contends that the Fishman Plan's damages should be measured as "the difference between what the actual portfolio earned and what a hypothetical, prudent portfolio would have earned."[9] Against this standard, the Fishman Plan earned more than $8,000 as a result of its

---

your calculations – I mean, the math is correct, the math is the math. That's not to say that that's going to be all of our damages." Konstandt Decl., Ex. C (Peiffer Tr. at 242).

[8] Mr. Nazzaro does not support Plaintiff's claim for injury as he acknowledged that he had no information as to whether the income that the Fishman Plan received from securities lending exceeded the $112.00 loss in the Quality D pool. Konstandt Decl., Ex. D (Nazzaro Tr. at 210) ("Q: Do you have information that the income paid to Fishman Plan and its participants as result of the collective trust funds' participation in securities lending did not exceed the unrealized -- the realized loss of $112.00? Mr. Collins: Note my objection. Go ahead. A: I have no information. Q: You don't know one way or the other? A: I don't know one way -- . Mr. Collins: Objection. A -- or the other").

[9] *See* Konstandt Decl., Ex. E (Letter from Gregory Y. Porter to Lori A. Martin, dated November 6, 2009) ("In cases alleging breach of duty in connection with the management of

investment in Quality D, exceeding the returns that the Fishman Plan would have received on the hypothetical prudent portfolio to which Plaintiff claims it was entitled.  Here, Plaintiff's hypothetical prudent portfolio is a collateral pool investing in short-term Treasuries and overnight repurchase agreements.  Declaration of Anthony A. Nazzaro, dated August 26, 2009 ("Nazzaro Decl. I") at ¶ 15.  *See also* Konstandt Decl., Ex. A (Tr. at 42-43) (stating at oral argument that "We are alleging that the collateral pools were imprudently managed.  Had they been prudently managed according to a conservative strategy, short-term Treasuries, et cetera, there would have indeed been a positive return in the collateral pools, which would have yielded increased net asset value to the investors in the collective trust").

The hypothetical portfolio, however, significantly underperforms the cash collateral pools that State Street managed for the ABA Trust.  As a result, the Fishman Plan earned *higher* returns than it would have received if State Street had followed the "short-term Treasuries" that Plaintiff has posited as the hypothetical prudent portfolio.  *See* Mackay Decl. at ¶ 45 (the "cash collateral pool yields even after the small realized losses have been deducted have been above typical money market yields and overnight repo Treasury rates"); *id.* at ¶¶ 13, 20, 35.  *See also* Mackay Decl., Ex. 1a (showing approximately 50 basis point incremental return of Quality D over the return of an index of money market funds and the overnight repo Treasury rate).

Plaintiff's expert similarly testified that the returns from the cash collateral pools exceeded the returns attainable through Plaintiff's hypothetical prudent portfolio:

> Q:      Okay.  If the Quality D fund had invested in overnight repos and treasuries as we discussed earlier today --
>
> A:      Uh-huh.

---

retirement plan investments, one measure of losses is the difference between what the actual portfolio earned and what a hypothetical, prudent portfolio would have earned").

Q:      -- how would the yield have performed compared to the way that State Street had managed it?

Mr. Collins:  Objection.

A:      My sense, in my opinion it would be -- it would be less than the Quality D yield.

Q:      And -- and it would be less than the money market fund too?

A:      It would probably also be less than the money market fund, yes.

Konstandt Decl., Ex. D (Nazzaro Tr. at 216).

Throughout the putative class period, the Fishman Plan earned higher yields in Quality D than were achievable through investments in money market funds or overnight repo Treasuries. Mackay Decl. at ¶¶ 13, 20, 35, 45; Mackay Decl., Ex. 1a.  Quality Trust for SSgA Funds ("Quality Trust"), a second cash collateral pool utilized by the ABA Trust, similarly achieved higher investment returns for the Fishman Plan and ABA Trust investors than would be achievable through the hypothetical prudent portfolio.  Mackay Decl. at ¶¶ 13, 20, 35, 45; *see also* Mackay Decl., Ex. 1b (comparing yields of Quality Trust to returns from an index of money market funds and the overnight repo Treasury rate).

Courts in this district have confirmed that Plaintiff has no standing to challenge an investment mandate that produced greater returns than investors would have received if the fiduciary had managed the portfolio in the manner proposed by Plaintiff:

> Even if the investment makes a profit, participants may suffer an injury if a prudent investment would have turned a greater profit.  *But participants can only recover if they can show that the value of the investments would have been greater had the fiduciary fulfilled its duty*.  The principal difficulty for Plaintiffs is that their overall investment in company stock units would have generated a lower profit had the stock not been artificially inflated during the Class Period.  Where a plaintiff's class period sales exceed purchases, the plaintiff has most likely benefitted from any alleged inflation in the stock price for that period.  *Plan participants who benefit from a fiduciary's breach of duty suffer no injury and have no constitutional standing*.

- 9 -

*In re Boston Scientific Corp. ERISA Litig.*, 254 F.R.D. 24, 30-32 (D. Mass. 2008) (dismissing claims for lack of standing because "Plaintiffs necessarily made more money when they cashed out than they would have earned absent Defendants' alleged breach") (emphasis supplied).

### C. THE FISHMAN PLAN MAY WITHDRAW IMMEDIATELY AND WITHOUT PENALTY FROM THE SECURITIES LENDING PROGRAM

There are no barriers to the Fishman Plan's immediate and complete exit from the securities lending program. Indeed, Plaintiff's supplemental opposition no longer maintains even the fiction that it faces barriers to exiting the securities program as withdrawal restrictions appears no where in that submission. *See* Opp. II, *passim*. The fact that Plaintiff dropped all pretense that it is forced to remain in the securities lending program confirms the unequivocal testimony that there are no withdrawal restrictions applicable to the Plans that invest in the ABA Trust. Ms. Mann, State Street's 30(b)(6) witness, explained:

> Q:   Do you know if there are any withdrawal restrictions that apply to the Fishman Plan?
>
> A:   There are currently no restrictions that apply to the Fishman Plan or any of the participants in the Fishman Plan.
>
> Q:   Have there ever been any withdrawal restrictions that apply to the Fishman Plan?
>
> A:   No, not to my knowledge.

Konstandt Decl., Ex. F (Transcript of Deposition of Ms. Kathleen Mann, dated January 6, 2010 ("Mann Tr.") at 128).

Plaintiff's 30(b)(6) representative similarly confirmed that the Plan has never faced withdrawal restrictions from the securities lending program:

> Q:   All right. Now, do you have information from any source that people in your fund, the Fishman Plan, meaning the Fishman firm's pension plan were prohibited at any time by State Street from selling out their interests in any of the Balanced Funds or the index funds or any other collective trust fund in which they were interested.

A:      At this time I think we can still do transactions.

Konstandt Decl., Ex. C (Peiffer Tr. at 164).

Moreover, any purchases or redemptions between the lending funds and the cash collateral pools attributable to Fishman Plan activity have been transacted at $1.00 per unit. Konstandt Decl., Ex. C (Peiffer Tr. at 159-63);[10] Mackay Decl. at ¶ 17; Konstandt Decl., Ex. G (American Bar Association Members/State Street Collective Trust December 31, 2008 Form 10-K at 108-09, at SS_FISH 0001606-07) ("purchases and redemptions of units in the cash collateral fund continue to be effected at a value equivalent to 100% of principal invested, even though, on a market basis at December 31, 2008, the related funds had net asset values ranging from $0.908 to $0.935 per unit"); Konstandt Decl., Ex. F (Mann Tr. at 60).[11]  As of February 4, 2010, the net asset value for Quality D and Quality Trust was $0.9900 and $0.9850, respectively. Declaration of Mr. Thomas Motley, dated February 23, 2010 ("Motley Decl.") at ¶ 5.  There is no evidence that the Fishman Plan cannot exit the program at full value.

---

[10] Mr. Peiffer testified that all transactions between the lending funds and the cash collateral pools have been executed at $1.00 per unit.  Konstandt Decl., Ex. C  (Peiffer Tr. at 163) ("Q:  All right.  Now, further, sir, are you aware of any transaction involving a collateral pool where the units weren't valued at $1.00?  A:  I am not aware of a transaction where they were valued at less than a dollar . . . ."); *id.* at 169-70.

[11] Over the past year, the mark-to-market valuation of the cash collateral pools has increased, responding favorably to the easing of the liquidity crisis.  Plaintiff argues that the Court should give no consideration to the improved market valuations of the cash collateral pools (Opp. II at 13), however, and contends further that transactions at $1.00 per unit are "not a viable means of determining whether cognizable losses have occurred" because State Street fair market values the holdings in the portfolios (Opp. II at 14).  It is not surprising that Plaintiff cites no legal support for this argument, as Section 2(a)(41) of the Investment Company Act expressly authorizes the use of fair market valuation.  *See* 15 U.S.C. § 80a-2(a)(41).  Plaintiff's expert, Mr. Nazzaro, acknowledged that he had no information that the use of amortized cost for valuing the assets of the cash collateral pools was inappropriate.  Konstandt Decl., Ex. D (Nazzaro Tr. at 146).

**D.** **THE FISHMAN PLAN CANNOT PARTICULARIZE AN INJURY RELATING TO THE MISSOURI FUNDS' EXIT FROM THE SECURITIES LENDING PROGRAM**

Plaintiff separately argues that it has incurred a non-specific injury because two Missouri retirement funds "exited the Collateral Pool" and "injured other investors like the Plan and the ABA Trust by 'sucking out' the liquidity in the fund, leaving less liquidity for the remaining investors." Opp. II at 4. Plaintiff, which can exit the securities lending program without limitation, nowhere particularizes how State Street's management of the securities lending program has harmed it. The cash collateral programs have sufficient liquidity to permit the Fishman Plan to exit the securities lending program and Plaintiff offers no evidence specifying how, if at all, the conduct of the Missouri funds impaired *its* performance in the securities lending program.

Even a cursory review of the underlying allegations in the Missouri litigation refutes Plaintiff's claim of injury in this case. In the Missouri litigation, two state pension funds sued State Street to limit its authority as Trustee for Quality D to take action on behalf of all investors in Quality D, including the Fishman Plan, by requiring that the two pension funds exit the securities lending program through an in-kind distribution of Quality D assets. After the Missouri plans withdrew $7 billion of their investment in Quality D, State Street informed the Missouri pension plans that they could not withdraw the remaining $1.5 billion without incurring a significant risk of injury to other investors in the cash collateral pool and that the plans would have to take an in-kind distribution of assets. Missouri brought a temporary restraining order in state court in Missouri, claiming that it was entitled to withdraw the remaining $1.5 billion without restriction. *See* Konstandt Decl., Ex. H (Verified Petition filed in *The Public School Retirement System of Missouri and The Public Education Employee Retirement System of*

*Missouri v. State Street Bank and Trust Company*, dated September 17, 2009 (Mo. Cir. Court, Div. II, 09AC CC00524)).

State Street opposed the temporary restraining order and argued, in the selective passages that Plaintiff quotes in its supplemental opposition, that withdrawal of the remaining $1.5 billion would create a significant risk of injury to other Quality D investors. The court denied Missouri's application for a temporary restraining order and State Street, acting as trustee on behalf of Quality D, reduced the remaining holdings of the two Missouri plans in the Fund to an in-kind distribution of assets. State Street acted for the benefit of the Fishman Plan and other investors in Quality D.[12]

Ms. Mann provided the following explanation of State Street's prudent response to efforts by the two Missouri plans to remove its disproportionate share of liquidity from Quality D:

> Q:    On page 24, Mr. Vigeland says that – who appears to be an attorney at Wilmer Cutler – says that there's no liquidity because Missouri has sucked a lot of it out, and there's real tangible damage to the remaining investors. Do you agree with Mr. Vigeland that there's been real tangible damage to the remaining investors?
>
> A:    No.
>
> Q:    Why do you think Mr. Vigeland is incorrect?
>
> A:    It's my understanding that State Street remedied the situation for investors, other investors exposed to the Quality D pool.
>
> Q:    And what did it do to remedy that?

---

[12] Although Plaintiff points to the transcript of the hearing as proof that it has suffered tangible harm (Opp. II at 4), oral argument in the Missouri state court actually focuses on the risk of harm of presented by Missouri's planned withdrawal of an additional $1.5 billion in cash. *See* Collins Decl., Ex. 3 (Transcript of Proceedings in the Circuit Court of Missouri, dated September 22, 2009 at 14 (discussing mark-to-market prices), 18-19 (stating that mark-to-market prices were improving)).

A:      I don't know all the details.

Q:      What do you know?

A:      That the State of Missouri was given a slice of assets in kind.

Q:      Do you know if the impact in liquidity described here by Mr. Vigeland had any
        effect on the income credited to lending funds by the Quality D Trust?

                                        * * *

A:      I don't know specifically.  However, my understanding is that State Street
        remedied the situation for any investors in the Quality D Collateral Pool.  There
        may be other ways; I don't know all of them.

Konstandt Decl., Ex. F (Mann Tr. at 132-34).

There can be no doubt, in the absence of responsible action by State Street as the Trustee

for Quality D, the two Missouri funds would have imposed a substantial risk of impairment to

the interests of other investors in Quality D.  State Street, however, took decisive action on

behalf of Quality D investors, including the Fishman Plan, and Plaintiff has not particularized a

specific injury to it as a result of any action by Defendants.  To the contrary – the fact that the

Fishman Plan can exit the securities lending program, immediately and without restriction, is

testament to State Street's prudent management of the cash collateral pools and its willingness to

oppose actions by investors who may harm the pools.

### E.      THE CURRENT INVESTMENT GUIDELINES ARE PRUDENT AND INJUNCTIVE RELIEF WOULD BE MOOT

Plaintiff has not demonstrated that the current investment guidelines for the cash

collateral pools are imprudent.  State Street amended the investment guidelines for the cash

collateral pools in March and April 2009.  Nazzaro Decl. I at ¶ 18.  In accordance with the

current investment guidelines for the Quality Trust cash collateral pool, the investment adviser is

permitted to purchase only those instruments that satisfy Rule 2a-7 of the Investment Company

Act of 1940 – the Rule specifying permissible investments for money market funds.  *See* Motley

Decl. at ¶ 7.  The investment guidelines for the Quality D fund have also been amended,

tightening the duration risk in the portfolio and reducing the percentage of asset-backed

securities that the Trustee may purchase in the portfolio.  *Id.*  Plaintiff's expert conceded, after a

time, that investments in accord with money market guidelines are prudent (Konstandt Decl., Ex.

D (Nazzaro Tr. at 82-83))[13] and that all three of Plaintiff's institutional securities lending clients

have invested their cash collateral in money market funds (*id.* at 65, 71, 74).  Moreover, Plaintiff

has offered no evidence to suggest that the more conservative investment guidelines now

governing Quality D would support the imposition of injunctive relief.  To the contrary, the

amendments to the investment guidelines appear generally to address the very concerns raised in

Mr. Nazzaro's declaration.

Independently, Plaintiff presented no evidence to suggest that the investments that State

Street made in accordance with its 1995 investment guidelines were imprudent.  Plaintiff's

expert conceded that he had no information regarding industry custom and practice for the

management of cash collateral pools.  Konstandt Decl., Ex. D (Nazzaro Tr. at 103-04).  He has

no demonstrable expertise in the management of cash collateral pools (*id.* at 123-24), and did not

know whether the risk profile for the cash collateral funds was excessive against any other

benchmark than his own particular preference (*id.* at 99).

Although Plaintiff's opposition papers assert without attribution that State Street

"invested in illiquid, risky securities" (Opp. II at 2), Plaintiff developed no evidence that the

securities that State Street purchased were imprudent at the time of the initial investment, or that

---

[13] Mr. Nazzaro testified: "[I]n general language, yes, I think that would be a – a prudent
reinvestment strategy for securities lending, yes."  Konstandt Decl., Ex. D (Nazzaro Tr. at 82).

the securities are of low quality today.  Mr. Nazzaro conceded that he conducted no credit

assessment of the securities in the cash collateral pools:

> A:     I don't want to shortcut this, but I think I said I did not do an analysis on any of these securities.
>
> Q:     Okay.
>
> A:     So I did not pull the Bloomberg or check any pricing services or anything regarding any of these securities on any of these documents.

Konstandt Decl., Ex. D (Nazzaro Tr. at 150).  He was unaware that the mark-to-market valuation

of the pools has improved since Plaintiff initiated this action (*id.* at 129), and that the asset-

backed securities in the cash collateral pool included instruments backed by federal guarantees

(*id.* at 154-55).  Plaintiff developed no evidence supporting its application for injunctive relief.

## CONCLUSION

For the foregoing reasons, and those set forth in Defendants' moving papers, the

Complaint should be dismissed because the Fishman Plan has not incurred an injury-in-fact and

has failed to demonstrate that injunctive relief is required to assure the prudent management of

the cash collateral pools.

Dated:   February 23, 2010
      New York, New York

Respectfully submitted,

 /s/ Lori A. Martin              
Lori A. Martin (*pro hac vice*)
Dawn M. Wilson (*pro hac vice*)
Brad E. Konstandt (*pro hac vice*)
WILMER CUTLER PICKERING
  HALE AND DORR LLP
399 Park Avenue
New York, NY 10022
Telephone: (212) 230-8800
Facsimile: (212) 230-8888
lori.martin@wilmerhale.com

Jeffrey B. Rudman (BBO #433380)
Phillipa J. Gage (BBO #664528)
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000
Facsimile: (617) 526-5000
jeffrey.rudman@wilmerhale.com

*Counsel for Defendants State Street*
*Corporation, State Street Bank & Trust*
*Company of New Hampshire, and State*
*Street Bank & Trust Company (including its*
*division State Street Global Advisors)*

**CERTIFICATE OF SERVICE**

I hereby certify that on February 23, 2010, I caused a copy of the Supplemental Memorandum of Law in Further Support of Defendants' Motion to Dismiss to be served electronically, via the electronic filing system, on the registered participants as identified on the Notice of Electronic Filing (NEF) and by first class mail on those indicated as non-registered participants.

/s/ Brad E. Konstandt_____

Brad E. Konstandt