UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                            )
FISHMAN HAYGOOD PHELPS WALMSLEY )
WILLIS & SWANSON, L.L.P.,       )
and all others similarly        )
situated,                       )
                                )
            Plaintiff,          )
                                )
      v.                        )CIVIL ACTION NO. 1:09-10533-PBS
                                )
STATE STREET CORPORATION; STATE )
STREET BANK & TRUST COMPANY,    )
STATE STREET BANK & TRUST       )
COMPANY OF NEW HAMPSHIRE, AND   )
STATE STREET GLOBAL ADVISORS,   )
                                )
            Defendants.         )
_____     )
```

**MEMORANDUM AND ORDER**

March 25, 2010

Saris, U.S.D.J.

## I.  INTRODUCTION

Plaintiff Fishman Haygood Phelps Walmsley Willis & Swanson,

LLP ("Fishman Haygood") brings this proposed class action[1]

against State Street Corporation ("SSC"), State Street Bank &

---

[1]     Count I of the Complaint alleges that defendants
violated ERISA Section § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B),
by failing to manage the Fishman Haygood Plan's assets with the
required care, skill, prudence, and loyalty.  Count II alleges
that the defendants violated Section 406(a)-(b) of ERISA, 29
U.S.C. § 1106(a)-(b), by engaging in self-dealing transactions
involving the Plan's assets.

-1-

Trust Company ("SSBT"), State Street Bank & Trust Company of New Hampshire ("SSNH"), and State Street Global Advisors ("SSGA"), alleging that the defendants breached their duties of prudence and loyalty by engaging in a securities lending program as part of their administration of a Trust Fund in which plaintiff was an investor.  Plaintiff claims that the defendants' reinvestment of collateral, obtained through the securities lending program, in long-term, high-risk instruments violated their duties under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1104(a)(1)(B), 1106(a)-(b).

Defendants filed a motion to dismiss plaintiff's complaint (Dkt. No. 18) on the ground that Fishman Haygood lacks Article III standing and statutory standing under ERISA because it has not suffered any actual injury.[2]

After a hearing followed by a period of limited discovery on jurisdictional issues, the Court finds that the plaintiff has not established Article III standing and therefore **<u>ALLOWS</u>** defendants' Motion to Dismiss.

## II.  BACKGROUND FACTS

The record contains the following facts relevant to the Article III standing issue.  (<u>See</u> Complaint; Wilson Decl., June 22, 2009 (including exhibits); Nazzaro Decl., Jan. 15, 2010;

---

[2] Defendants also contend that plaintiff has failed to make sufficient allegations to support its claim that defendants' actions breached duties of prudence and loyalty under ERISA.

Mackay Decl., Feb. 23, 2010; Konstandt Decl., Feb. 23, 2010
(including exhibits).)

A.  **Securities Lending**

Plaintiff is a law firm that administers the Fishman Haygood
Phelps Walmsley, Willis & Swanson, LLP Profit Sharing Plan ("the
Plan"), an ERISA defined contribution plan.  The Plan invested in
collective trusts managed by the defendants through the American
Bar Association Retirement Fund Program.  The particular trust at
issue here is the American Bar Association Members/State Street
Collective Trust ("ABA Trust").  A collective trust is an
investment option established for the collective investment of a
group of institutional investors, including retirement plans and
pension funds.  All of the investors share, pro rata, in the same
gains and losses.  (Compl. ¶ 4.)

The ABA Trust, managed by defendants, engaged in a practice
called securities lending.  In simplified terms, securities
lending involves the temporary loan of a stock (or other
security) by its long-term owner - often a large, institutional
investor - to a borrower - such as a hedge fund - that needs the
security for various short-term purposes.  This borrower secures
the loan of the stock or security by providing the long-term
owner with collateral that usually slightly exceeds the value of
the security.  In this case, the borrowers provided collateral
equal to 102% to 105% of the value of the borrowed securities.

-3-

(<u>Id.</u> ¶ 7.)  This collateral was placed into "Collateral Pools,"
which then are supposed to invest in lower-risk, liquid
instruments so that the long-term owner of the stock is able to
receive investment income from the collateral investment.  (<u>Id.</u> ¶
2.)

In addition to the general management fees collected by
defendants as compensation for managing the Plan's investment,
the defendants receive fifty percent of any profits that the Plan
earns from the Collateral Pools.  Any losses sustained by the
Collateral Pools, however, are not shared by the defendants.
(<u>Id.</u> ¶ 10.)

B.    **Management of the Collateral Pools**

The lending agreement signed by defendants and the Plan
states that State Street will invest collateral from the
securities lending program in "short-term instruments, short term
investment funds maintained by State Street, money market mutual
funds, and such other instruments as State Street may from time
to time select."  (Def.'s Ex. I ¶ 9.)  Plaintiff alleges that
defendants in fact invested the Collateral Pools in "instruments,
including mortgage-backed securities, with unusually high risk
and unusually long duration."  (Compl. ¶ 38.)

As a general rule, the Collateral Pools managed by
defendants utilize amortized cost pricing of the underlying
investments, which is a pricing method that allows the defendants

to maintain a constant price for units purchased in, or redeemed from, the Collateral Pools.  This means that defendants do not "mark-to-market"[3] underlying investments, which would result in a fluctuating value for the units of the Collateral Pool.  (Id. ¶ 31.)  In other words, even if the mark-to-market accounting method would value units of the Collateral Pools at less than one dollar, the amortized cost pricing method allows defendants to continue to transact sales and purchases of Collateral Pool units at a price of one dollar.

## C.   **Claims of Injury**

Plaintiffs allege that the Collective Trusts can suffer losses based on their investments in the Collateral Pools in two ways.  First, if a Collateral Pool suffers losses on its investments, or if its underlying investments default, there may be insufficient liquidity in the Collateral Pool to discharge its obligations to fund cash payments to borrowers of the securities and the Collateral Pool may be required to sell investments prior to their maturity at a loss.  Second, losses on investments or defaulted investments may cause the Collateral Pools to cease the use of the amortized cost pricing method, which would force defendants to reduce the value of units.  (Id. ¶ 31.)  If either

---

[3] "Mark-to-market" accounting is a method of accounting that values financial instruments based on current fair market prices for that instrument or similar instruments.  See MMC Corp. v. Comm'r of Internal Revenue, 551 F.3d 1218, 1219 (10th Cir. 2009) (citing 26 U.S.C. § 475(a)(2)(A)).

of these scenarios were to occur, plaintiffs allege that the Collective Trusts would be "obligated to utilize their own assets and cash to satisfy any deficiency or losses" suffered by the Collateral Pools.  This would, in turn, cause injury to the plaintiff.  (Id.)

None of the securities in the Collateral Pools was in default or considered to be impaired at December 31, 2008, and the Collateral Pools had adequate sources of liquidity from normal lending under defendants' securities lending program as of that date.  (Compl. ¶ 36.)  However, plaintiff claims that it still suffered injury because, as of December 31, 2008, the Collateral Pools had an average net asset value of approximately $0.93 per unit.  (Id. ¶ 11.)  The $0.93 average reflects the mark-to-market valuation, and not the amortized cost pricing.  However, investors in the Collective Trusts, including the plaintiff, may still transact with the Collateral Pools at a price of $1.00 per unit. (See Konstandt Decl. Ex. F, at 60-61 (Deposition of Kathleen Mann, Defendants' 30(b)(6) witness).)

In addition to the direct injury caused by the alleged losses in net value suffered by the Collateral Pools, the plaintiff alleges that it has further been injured because the market values of the Collective Trusts have been negatively impacted by the losses of the Collateral Pools.  The defendants' filings with the Securities and Exchange Commission (SEC) reflect that "Funds and Retirement Date Funds have . . . recognized

unrealized losses in the December 31, 2008 financial statements." (Def.'s 2008 10-K at 108-09.)  Those filings stated that the losses for each Collateral Pool were due to "losses on longer duration instruments stemming from a lack of liquidity in the secondary market."  (<u>Id.</u> at F-126.)

Although defendants have not imposed any restrictions on individual Participant or Employer withdrawal "in the ordinary course," they have stated that the withdrawal of an entire Collective Trust, such as the ABA Trust in which plaintiff participates, will

> result in such [Collective Trust] receiving a pro rata in-kind distribution of securities from the cash collateral funds to the extent its securities are on loan at the time of such a withdrawal.  If, at the time of any such in-kind distribution, the mark-to-market value of the securities in the cash collateral funds is less than the amortized cost value used in connection with calculation of Unit net asset values, such distribution could result in such mark-to-market value being recognized.

(<u>Id.</u> at 83.)

D.  **Expert Reports**

At the direction of the Court, the parties conducted limited discovery on the jurisdictional issues presented by this motion to dismiss.  Through the discovery process, both parties employed experts to evaluate any injury suffered by the plaintiff.  The experts filed reports and their depositions were taken.

Plaintiff's expert, Anthony A. Nazzaro, holds a Bachelor's degree in Finance from Seton Hall University and a law degree

from Quinnipiac University Law School.  He is currently the Principal and Founder of A.A. Nazzaro Associates, a securities lending management and consulting group that has been in business for 22 years.  Nazzaro's firm is a manager of securities lending programs for institutional clients and also provides consulting services to clients in the securities lending industry.  (Nazzaro Decl. ¶¶ 1, 4, Aug. 26, 2009.)  Nazzaro has also served as the Divisional Vice President and Director of the Securities Lending Division of the Trust Department at First Pennsylvania Bank and has worked in the Treasurer's Office at Yale University.  (Id. ¶¶ 2-3.)

Defendants' expert, Dr. Robert J. Mackay, holds a Ph.D. in Economics from the University of North Carolina at Chapel Hill and is currently the Senior Vice President and Chair of the Global Securities and Finance Practice of National Economic Research Associates where he specializes in providing securities and financial markets litigation support and risk management advisory services.  (Mackay Decl. ¶¶ 1, 11, Feb. 23, 2010.)  Dr. Mackay has also taught as a Professor of Finance at Virginia Polytechnic Institute and State University and served as the Chief of Staff of the U.S. Commodity Futures Trading Commission in the late 1980s.  (Id. ¶¶ 2, 5.)

### III.   ANALYSIS

#### A.   <u>Legal Standard</u>

Motions to dismiss for lack of Article III standing are related to subject matter jurisdiction and are therefore analyzed under Rule 12(b)(1) of the Federal Rules of Civil Procedure. <u>United Seniors Ass'n v. Philip Morris USA</u>, 500 F.3d 19, 23 (1st Cir. 2007). "Federal courts are required to determine whether Article III jurisdiction exists prior to proceeding to the merits of the case." <u>Id.</u> (citing <u>United States v. Union Bank for Sav. & Inv.</u>, 487 F.3d 8, 22 (1st Cir. 2007)). The First Circuit has held that district courts may take into account documents beyond the complaint "when there is some doubt about a court's subject matter jurisdiction." <u>Coyne v. Cronin</u>, 386 F.3d 280, 286 (1st Cir. 2004) (citing <u>Dynamic Image Techs., Inc. V. United States</u>, 221 F.3d 34, 37-38 (1st Cir. 2000)). Review of documents outside the complaint is appropriate when such documents are "pertinent to the jurisdictional inquiries that the district court [is] obliged to conduct." <u>Id.</u>

Because of the complexity of the investments and the difficulty of determining injury, the Court entered an order permitting the parties to conduct limited discovery and submit expert reports to develop a record with respect to the jurisdictional issues. (<u>See</u> Hr'g Tr., Oct. 14, 2009 at 48.)

B.   **Article III Standing**

Defendants argue that the plaintiff lacks standing under
Article III of the Constitution.  Article III standing
requirements "are expressed in a familiar three-part algorithm: a
would-be plaintiff must demonstrate a concrete and particularized
injury in fact, a causal connection that permits tracing the
claimed injury to the defendant's actions, and a likelihood that
prevailing in the action will afford some redress for the
injury."  Me. People's Alliance & Natural Res. Def. Council v.
Mallinckrodt, Inc., 471 F.3d 277, 283 (1st Cir. 2006) (citing
Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992)).
The defendants' argument focuses on the injury-in-fact
requirement, which states that a plaintiff must "show that he
personally has suffered some actual or threatened injury as a
result of the putatively illegal conduct of the defendant."
Bender v. Williamsport Area Sch. Dist., 475 U.S. 534, 542 (1986)
(internal quotation marks omitted); see also Cent. States
Southeast & Southwest Areas Health & Welfare Fund v. Merck-Medco
Managed Care, LLC, 433 F.3d 181, 200 (2d Cir. 2005) ("[A]n ERISA
Plan participant or beneficiary must plead a direct injury in
order to assert claims on behalf of a Plan.").

Of particular importance here is the principle that
"standing is to be 'assessed under the facts existing when the
complaint is filed.'"  Becker v. Fed. Election Comm'n, 230 F.3d

381, 387 n.3 (1st Cir. 2000) (quoting <u>Lujan</u>, 504 U.S. at 571 n.4).  Plaintiff filed its complaint on April 7, 2009.

In evaluating the existence, or lack thereof, of injury-in-fact for purposes of Article III standing, the Supreme Court has held that "[t]he actual or threatened injury required by Art. III may exist solely by virtue of statutes creating legal rights, the invasion of which creates standing." <u>Warth v. Seldin</u>, 422 U.S. 490, 500 (1975) (internal citations omitted).  In this case, the injury required arises by virtue of alleged violations of rights created in ERISA.  The First Circuit has held that such injury "may be ascertained, with the help of expert analysis, by comparing the performance of the imprudent investments with the performance of a prudently invested portfolio." <u>Evans v. Akers</u>, 534 F.3d 65, 74 (1st Cir. 2008) (citing <u>Graden v. Conexant Sys., Inc.</u>, 496 F.3d 291, 301 (3d Cir. 2007)).

Plaintiff argues that it suffered $112 in net realized losses and that its net unrealized losses totaled $23,564. (Nazzaro Decl. ¶ 7, Jan. 15, 2010.) Plaintiff's expert, Anthony A. Nazzaro, examined the Quality D Fund, which is one of the Collateral Pools at issue in this case.  Nazzaro concluded that the ABA Trust as a whole suffered $70,986 in net <u>realized</u> losses as of December 31, 2008 based on investments of the Quality D Fund.  (<u>Id.</u>)  Because the Fishman Plan's assets constitute 0.16% of the ABA Trust's total assets, the plaintiff suffered a net realized loss of $112.  (Konstandt Decl. Ex. C, at 240-42

-11-

(Nazzaro Deposition).)  Nazzaro went on to conclude that the ABA
Trust suffered $14,727,290 in net <u>unrealized</u> losses as of
December 31, 2008.  (Nazzaro Decl. ¶ 7.)  Again applying the
0.16% pro rata share, under Nazzaro's analysis the Plan suffered
around $23,564 in net unrealized losses.

Defendants respond to Nazzaro's conclusions regarding
realized and unrealized losses in three ways.  First, defendants
make much of the fact that the net asset value of the Collateral
Pools has increased from $0.93 to $0.99 between December 2008 and
January 2010.  Second, defendants' expert, Dr. Robert Mackay,
also points out that due to the increase in the net asset value
of the Collateral Pools, the plaintiff's <u>unrealized</u> losses as of
January 31, 2010 at $5,537, or $3,050 less than the $8,587 in
income received by the plaintiff from the securities lending
program over the indicated time period.  (<u>Id.</u> ¶ 20.)[4]  Third,
Mackay performed an analysis to determine what returns plaintiff
would have received had the defendants invested the Collateral
Pools in money market or overnight Treasury securities, which
plaintiff contends would have been the prudent course.  (Compl.
¶¶ 3, 11.)  Under his analysis, the hypothetical "prudent"
investments would have earned lower returns than those actually
received by the Plan.  (<u>Id.</u> ¶ 45.)

---

[4] However, standing must be determined as of April 2009, the
date the complaint was filed, and defendants' expert has not
provided specific numerical data regarding values on that date.

-12-

Given that the bulk of plaintiff's claimed damages are
represented by unrealized losses, the Court begins its analysis
by considering that issue.  The First Circuit has held that
"unrealized" economic injury can be sufficient to confer Article
III standing.  See Adams v. Watson, 10 F.3d 915, 920 (1st Cir.
1993) ("Although at the pleading stage 'injury-in-fact' need not
entail currently realized economic loss, Article III standing in
the commercial context must be premised, at least at a minimum,
on particularized future economic injury which, though latent,
nonetheless qualifies as 'imminent.'") (emphasis in original).

Plaintiff has alleged that it suffered $23,564 in unrealized
losses as a result of defendants' securities lending practices.
This unrealized loss caused the market value of the ABA Trust, in
which plaintiff is an investor, to drop, resulting in a reduction
in value of one of plaintiff's assets.  (Nazzaro Decl. ¶ 7;
Compl. ¶¶ 35, 37.)  These allegations of injury are supported by
defendants' SEC filings that refer to losses suffered by the
Collective Trusts.

Other courts have held that a reduction in value of a
party's asset is sufficient to confer standing in the context of
real property.  For example, in a case involving reduced property
values of plaintiffs' homes and businesses, the Fifth Circuit
held that

> such a loss remains in one sense unrealized until the
> property is sold.  Nevertheless, a market devaluation
> has present adverse consequences short of realization

-13-

through sale.  The knowledge that sale of the property may bring in fewer proceeds will influence and restrict the willingness to sell.  Further, a market devaluation will lessen the property owner's eligibility for loans secured by the property.

Allandale Neighborhood Ass'n v. Austin Transp. Study Policy Advisory Comm., 840 F.2d 258, 262-63 (5th Cir. 1988) (citing Alschuler v. Dep't of Housing & Urban Dev., 686 F.2d 472, 476-77 (7th Cir. 1982) (holding that an allegation that property values were adversely affected was "sufficient to confer Article III standing")).  A reduction in the value of a retirement fund may similarly affect a Plan's decisions about when and how to invest its assets.

Although plaintiff has identified unrealized losses, it must overcome the fact that the Plan may still withdraw its investment in the Collateral Pools at a rate of $1.00 per unit.  (See Konstandt Decl. Ex. F, at 60-61.)  Because defendants do not utilize mark-to-market accounting with respect to valuing the units of the Collateral Pools, and have guaranteed that plaintiff may withdraw from the Collateral Pools without penalty, its unrealized losses do not, in fact, represent a present injury.  (Mackay Decl. ¶ 22) ("Since all transactions for the Fishman Plan to date have occurred at participating fund [Net Asset Values] that utilize a cash collateral pool par NAV of $1, there are no out-of-pocket losses for the Plan due to the mark-to-market NAV of the cash collateral pool being lower than $1.").)  Mackay also

states that any unrealized losses would injure the Fishman Plan only under "very limited and specific circumstances." (<u>Id.</u>; <u>see also</u> Mackay Decl. ¶ 38 (describing "two existing hypothetical scenarios.").)  Plaintiffs have not shown that any injury from these unrealized losses is imminent.

In other words, Fishman Haygood may hold an asset that has a reduced value when marked to market, but could withdraw its funds at $1.00 per unit, a rate that does not reflect the reduced value.  Accordingly, plaintiff's unrealized loss of $23,564 is not enough, on its own, to establish injury for the purposes of Article III.

Defendants also argue that a comparison of Collateral Pool investments with the performance of the hypothetical prudent portfolio undermines the plaintiff's claims of injury.  The First Circuit has defined the appropriate measure of damages in an ERISA case alleging imprudence as a comparison between investments made by a defendant and a hypothetical, prudent investor.  <u>See</u> <u>Evans</u>, 534 F.3d at 74 ("Losses to a plan from breaches of the duty of prudence may be ascertained, with the help of expert analysis, by comparing the performance of the imprudent investments with the performance of a prudently invested portfolio.") (citing <u>Graden</u>, 496 F.3d at 301); <u>see also</u> <u>In re Boston Scientific Corp. ERISA Litig.</u>, 254 F.R.D. 24, 30-32 (D. Mass. 2008) (stating that ERISA plan participants "can only

-15-

recover if they can show that the value of the investments would have been greater had the fiduciary fulfilled its duty").

Plaintiff defines prudent investments for securities lending collateral as "short-term Treasuries" and money market funds. (See Compl. ¶¶ 3, 11; Konstandt Decl. Ex. D, at 82:16-82:23 (Nazzaro Deposition) (stating that investing in money market funds "would be [a] prudent reinvestment strategy for securities lending").) Mackay provided a graph showing that the allegedly imprudent investments made by State Street outperformed hypothetical investments in "short-term Treasuries" and money market funds at all times between January 1, 2007 to January 31, 2010, and most importantly in April 2009 when the complaint was filed.



Exhibit 1a: Quality D Yield Compared to Money Market Fund Index and Overnight Repo Treasury Rate
January 1, 2007 through September 30, 2009

(Mackay Decl. Ex. 1a.)   In fact, in April 2009, it appears that the Quality D Collateral Pool was outperforming both hypothetical investments by more than 0.5%.   Plaintiff's expert, Anthony Nazzaro, stated in his deposition that, assuming Dr. Mackay's graph was based on reliable data, he would agree with the conclusion that the hypothetical investments would have been outperformed by the actual investments made by the defendants. (Konstandt Decl. Ex. D, at 215-16.)   Accordingly, under the measure of damages defined by the First Circuit in Evans, the plaintiff has not established injury-in-fact for the purposes of Article III standing.

The plaintiff has also made claims for disgorgement and other equitable remedies available under ERISA.   Such claims could potentially provide another source of "loss" for the purposes of a constitutional and statutory standing analysis. See Leigh v. Engle, 727 F.2d 113, 122 (7th Cir. 1984) ("ERISA clearly contemplates actions against fiduciaries who profit by using trust assets, even where the plan beneficiaries do not suffer direct financial loss."); Framingham Union Hosp., Inc. v. Travelers Ins. Co., 721 F. Supp. 1478, 1487 (D. Mass. 1986) (ERISA § 409 "renders any gain a fiduciary acquires through the improper use of plan assets forfeit, irrespective of any proof of actual financial loss to the fund.").   Nonetheless, in an ERISA case, "[r]equests for restitution or disgorgement . . . require[] that a plaintiff satisfy the strictures of constitutional

-17-

standing by demonstrating individual loss." <u>Cent. States</u>
<u>Southeast & Southwest Areas Health & Welfare Fund v. Merck-Medco</u>
<u>Managed Care, LLC</u>, 433 F.3d 181, 200 (2d Cir. 2005).

It is true that equitable relief might be appropriate if
plaintiff could establish threatened injury because defendants
were continuing to make imprudent investments.  However,
defendants have shown that the investment guidelines for the
Quality D Collateral Pool have been amended to "shorten the
maximum option adjusted duration of fixed-rate securities from 30
months to 18 months, and to reduce the percentage of asset-backed
securities in the portfolio from 50% to 25%."  (Motley Decl. ¶ 7,
Feb. 23, 2010.)  Without demonstrating a threat of injury due to
evidence of continuing unlawful action, the availability of
equitable remedies is not an appropriate measure of loss for
Article III standing purposes.  <u>See Steir v. Girl Scouts of the</u>
<u>USA</u>, 383 F.3d 7, 16 (1st Cir. 2004) ("To demonstrate the prospect
of future harm, the essential prerequisite for equitable relief,
a plaintiff must show more than that she has been injured by an
unlawful practice.  'Past exposure to illegal conduct does not in
itself show a present case or controversy regarding injunctive
relief, however, if unaccompanied by any continuing present
adverse effects.'" (quoting <u>O'Shea v. Littleton</u>, 414 U.S. 488,
495-96 (1974))).  Therefore, under the measure of individual loss
described above and established for ERISA litigation by the First

Circuit, plaintiff has not met its burden.   See <u>Ramirez v.</u>
<u>Sanchez Ramos</u>, 438 F.3d 92, 97 (1st Cir. 2006) (holding that
plaintiff bears the burden of establishing constitutional
standing).

## IV.   CONCLUSION

The defendants' motion to dismiss (Docket No. 18) is
<u>**ALLOWED**</u>.

_____
PATTI B. SARIS
United States District Judge